UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PAICE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 2:07-CV-180-DF |
| TOYOTA MOTOR CORPORATION, a | § | |
| Japanese Corporation, TOYOTA MOTOR | § | |
| NORTH AMERICA, INC., and TOYOTA | § | |
| MOTOR SALES, U.S.A., INC., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
JAMES PRESS'S MOTION FOR PROTECTIVE ORDER (DKT. 81)**

Plaintiff Paice LLC ("Paice") files this response in opposition to the Motion for Protective Order filed by Mr. James Press. Mr. Press was subpoenaed due to his unique knowledge of certain relevant facts at issue in this case. For the reasons stated below, Paice respectfully requests that the Court deny Mr. Press's Motion for a Protective Order.

I.    **BACKGROUND**

A.    **Paice I**

Paice first sued Toyota for patent infringement in 2004 upon the launch of three Toyota hybrid vehicles: the 2004 model year Toyota Prius, the Toyota Highlander hybrid, and the Lexus RX400h. *Paice LLC v. Toyota Motor Corp. et al.*, C.A. No. 2-04-CV-211-DF (hereinafter "*Paice I*"). In December 2005, a jury determined that the Toyota vehicles infringe Paice's United States Patent No. 5,343,970 ("the '970 patent"). Following trial, Paice requested a permanent injunction, which the Court denied in light of an intervening Supreme Court decision

1

relating to permanent injunctions in patent cases.[1]  *See Paice LLC v. Toyota Motor Corp*., 2006 U.S. DIST. LEXIS 61598, 2006 WL 2385139 (E.D. Tex. Aug. 16, 2006).  Instead, the Court set an ongoing royalty rate that Toyota would pay Paice for each infringing vehicle sold.  The United States Court of Appeals for the Federal Circuit upheld the liability verdict, but remanded for the limited purpose of determining an appropriate ongoing royalty rate.  *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007).  Mr. Press was a high-level executive at Toyota throughout *Paice I*, the post-trial briefing, appellate briefing, and at oral argument.

On remand, the Court held a bench trial in July 2008 to determine the appropriate royalty rate, but allowed only limited additional discovery before that trial.  The parties and their experts relied largely on hearsay evidence to demonstrate the value of the infringing technology to Toyota and the automobile industry.  Paice learned from reviewing publicly available information for admissions and relevant information that Mr. Press was frequently quoted in Toyota press releases and the news media on these points.  At trial, Paice relied on the statements from Mr. Press, but was unable to get any corroborating information or statements from Toyota. The Court ruled on the remanded issue on April 17, 2009.  *Paice I* at Dkt. No. 266.

### B.    Paice II

In 2007, Paice brought this second suit against Toyota ("*Paice II*").  Since the trial in *Paice I*, Toyota has continued to introduce new hybrid vehicles into the United States market including, for example, the Toyota Camry, the Lexus GS450h, and the Lexus LS600h.  Paice alleges that these new vehicles also infringe the '970 patent, and that all of Toyota's hybrids infringe two additional patents.  The completion of fact discovery is scheduled for June 5, 2009, and the trial is currently scheduled for October 2009.  *Paice II* at Dkt. No 77.

---

[1]  *eBay Inc v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

In *Paice II*, Paice has not requested an injunction and instead expects that, after it prevails, the Court will set an ongoing royalty rate for these additional acts of infringement. Therefore, it is critical that the real and perceived value of hybrid technology to Toyota be established.  Accordingly, Paice is seeking discovery that was not made available to the parties or presented to the Court in *Paice I*.  In particular, Toyota (through its damages expert) claimed at the *Paice I* bench trial that its hybrid technology is not very valuable to its business and specifically asserted that it is not essential to Toyota's success in the marketplace:

> Mr. Love [Toyota's witness on emissions regulations and legislation] says that – testified to the fact that Toyota would be able to meet its CAFÉ standards requirements even if there had been no hybrids in its fleet because of the high fuel efficiency of the conventional – of its non-hybrid technology . . . .
>
> \* \* \* \* \*
>
> [Paice's expert] failed to recognize the importance of the fact that hybrid margins were being squeezed and, in some instances, there was no profit to divide, no profit from hybridness from the contribution of this, supposed contribution of this technology between the licensor and the licensee. He spoke of his method as a profit sharing method, but failed to recognize that sometimes there are no profits to divide, and didn't take that into account.

*Paice I* Bench Trial (Exhibit A) at 195, 209.

## C.    Importance of Mr. Press

The position Toyota took in the *Paice I* bench trial regarding the lack of value in hybrid technology runs directly counter to numerous statements made by Mr. Press.  During *Paice I*, Mr. Press was President and Chief Operating Officer of Toyota Motor North America and a Senior Managing Director of its parent company, Toyota Motor Company.  Mot. for Protective Order at Ex. B ¶ 4.  Mr. Press was the first non-Japanese member of Toyota's management board.  *See* Ex. B, Sept. 6, 2007 (Bloomberg.com); *see also* Ex. I, Toyota Motor Corporation News Release June 22, 2007.  Mr. Press worked at Toyota for 37 years and has an intimate knowledge of Toyota's cost/benefit analysis and foray into the United States market for hybrid

Dallas 276484v1

vehicles that is unmatched by anyone remaining at Toyota.  For example, in 2003, when Toyota was preparing to launch the Toyota Prius II (Toyota's first successful hybrid vehicle in the United States) and dramatically change the automobile industry, Mr. Press reportedly was dividing his time between the United States and Japan managing the rollout of Toyota's hybrid program.  *See* Ex. C, "Toyota's Secret Weapon."  Mr. Press had been named a managing officer, one rung below the board of directors, and was working to oversee Toyota's global operations at the time, in addition to his role in developing vehicles to be sold in the United States.  *Id.*

Mr. Press's influence on Toyota's adoption of hybrid technology is widely recognized in the automotive industry.  For example, in its 2004 profile on Mr. Press, Fortune Magazine stated that "the most delicate part of his job" is "badgering his employers into making vehicles that will sell in the U.S., such as the redesigned Sienna minivan, *the hybrid Prius*, and the new entry-level Scion line."  *See* Ex. C, "Toyota's Secret Weapon" (emphasis added).  In the same timeframe, Mr. Press was frequently featured in the press and quoted about the value of the Prius and Toyota's hybrid program.  For example:

- People waited months to get their Priuses, as production struggled to keep pace with demand. U.S. sales doubled to 53,991 in 2004 and nearly doubled again to 107,897 the following year -- about 60% of global Prius sales. "It's the hottest car we've ever had," says Jim Press, president of TMS.  *See* Ex. D, "Toyota: The Birth of the Prius," PTX-302 at 4.

- The knocks against hybrids are all true. But what the critics didn't put a price on was the value of being seen as eco-sensitive without giving up performance. "Does it save enough money to pay for itself?" asks Press. "That's not the idea. What's the true cost

of a gallon of gas, if you factor in foreign aid, Middle Eastern wars, and so on? The truth is on our side." *See* Ex. D, "Toyota: The Birth of the Prius," PTX-302 at 5.

- "The expansion of fuel-efficient products was really unanticipated. Hurricane Katrina, $3-a-gallon-fuel, and awakening of American understanding of the environment. These issues were all bubbling up at the same time." *See* Ex. E, Harbour Report at 211

Mr. Press also made statements to the press demonstrating his unique knowledge of the source of research and development funds used by Toyota to develop the accused hybrid vehicles—statements that Toyota has disputed. For example:

- Mr. Press stated in an interview on March 20, 2008 that "[t]he Japanese government paid for 100% of the battery and hybrid system that went into the Prius." *See* Ex. F, March 24, 2008 Business Week.

- In a story published by the Associated Press on April 2, 2008, it was reported that "Toyota said the report was untrue." *See* Ex. G, Associated Press article at Boston.com.

- Following the denial by Toyota, Mr. Press issued a statement that "[t]he Japanese government strongly supported R&D (research and development) investment in battery development, and the Prius and other Japanese models benefited from that investment." *See* Ex. H, April 2, 2008 Business Week

To counter Toyota's assertions that the hybrid technology is not very valuable, Paice expects that a part of its evidence demonstrating the appropriate royalty rate for the Paice patents will be testimony from Mr. Press which, on its face, is highly relevant and uniquely possessed by Mr. Press, because he is the person in a unique position to explain the statements that he

5

personally made in the press.  Thus, Paice seeks the opportunity to depose Mr. Press on the limited subject of the value of hybrid technology to Toyota and to the automobile industry generally, as well as any additional information that formed the basis for his numerous public statements on those topics.

Mr. Press argues in his motion for a protective order that (i) the subpoena is burdensome as he was not involved with the *Paice I* litigation and has no knowledge regarding that litigation or knowledge of the issues in *Paice II*, and (ii) it would seriously disrupt his daily responsibilities at Chrysler LLC.  *See* Mot. for Protective Order at 2.  Neither of these reasons justifies a protective order preventing his deposition here on the topics upon which he, as President and CEO of the U.S. Toyota Organization and as a member of the Senior Management Team of Toyota Motor Corporation, spoke publicly—the value of hybrid technology to Toyota.

## II.    ARGUMENT

### A.    Legal Standard

The district court has broad discretion in discovery matters.  *Sanders v. Shell Oil Co.*, 678 F.2d 614, 618 (5th Cir. 1982).  As a general matter, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).  Rule 26(c) allows the Court to issue protective orders only for good cause shown to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including that the disclosure or discovery not be had or that the disclosure or discovery be limited to certain matters.  Fed. R. Civ. P. 26(c).  "Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that 'the burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'"  *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett*, 571 F.2d 1323,

6

1326 n.3 (5th Cir. 1978)).   A declaration that makes conclusory assertions about a "busy schedule" and "lack of knowledge," but which states no specific facts from which the court may conclude that it will be unduly burdensome for the deponent to appear, is insufficient to carry the burden for entry of a protective order.  *See Grateful Dead Productions v. Sagan*, 2007 U.S. Dist. LEXIS 56810 at 6-7 (N.D. Cal. July 26, 2007).   Further, protection is not appropriate where, as here, there appears to be a factual dispute as to whether the deponent has first-hand knowledge of relevant facts.  *See id*. at *7.   Moreover, the fact that an executive has a busy schedule is not a basis for foreclosing otherwise proper discovery.  *Burns v. Bank of Am.*, 2007 U.S. Dist. LEXIS 40037, at *9-10 (S.D.N.Y. June 4, 2004); *Consolidated Rail Corp. v. Primary Indus. Corp*., 1993 U.S. Dist. LEXIS 12600 at *2 (S.D.N.Y. Sept. 10, 1993).

### B.   The Court Should Not Grant the Protective Order As the Subpoena Is Not Unduly Burdensome Within the Meaning of Rule 45(c)(3)(A)(iv)

Whether a subpoena subjects a party to undue burden within the meaning of Rule 45(c)(3)(A)(iv) is a determination of reasonableness, which requires a court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it.  *See generally*, 9A *Wright & Miller* § 2463 (2d ed. 1994).   Paice's subpoena to Mr. Press is not abusive and is narrowly tailored so as to be reasonable.   Paice's request is not "unreasonably cumulative or duplicative" or obtainable "from some other source that is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C)(i).   Mr. Press has unique knowledge relevant to Paice's damages claim against Toyota and is the best source of this knowledge.

For example, Mr. Press has unique personal knowledge regarding Toyota's decision to launch hybrid vehicles in the United States and the costs and benefits of the decision.   Further, the publicly available information all suggests that Mr. Press was integral to making the decision

7

and is the person in the best position to provide testimony on why Toyota decided to pursue the hybrid program as it did during the relevant time period.  *See Anderson v, Air West, Inc.*, 542 F.2d 1090, 1092-93 (9th Cir. 1976) (finding plaintiffs may depose sole stockholder who "probably had some knowledge" regarding substance of plaintiffs' claims); *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (district court erred in granting protective order ordering plaintiff not to depose Herald-Examiner's publisher when plaintiff suggested possible information publisher might have that others did not); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 102-06 (S.D.N.Y. 2001) (compelling deposition of CEO of Sony Corporation when plaintiff "presented sufficient evidence to infer that [CEO] had some unique knowledge on several issues related to its claims").

In his motion, Mr. Press fails to explain why his unique and personal knowledge of the success of Toyota's hybrid program is irrelevant or duplicative but instead focuses on his alleged lack of knowledge of the litigation and his status as a busy senior executive of Chrysler.  Mr. Press's arguments in this regard are unpersuasive.  Mr. Press's public statements show that he possesses personal knowledge of the value of Toyota's hybrid program.  Discovery from another source "would be a poor substitute for [Press's] testimony regarding his own personal knowledge and actions."  *See Mansourian v. Board of Regents*, 2007 U.S. Dist. LEXIS 95428, at *9-10 (E.D. Cal. Dec. 21, 2007) (finding university chancellor's personal involvement in compliance of university's athletic programs at issue was demonstrated by his testimony before a senate committee regarding same and showed that discovery from a "less burdensome" source would be a poor substitute for chancellor's testimony).

Mr. Press erroneously focuses on the situation where a party seeks to depose the senior executives of an opposing party.  Mr. Press acknowledges as much in his motion.  As stated by

Mr. Press, in those situations "there must be a level of personal knowledge that makes the testimony of the executive necessary because it is unique, or superior to that possessed by other, lower level employees."  Mot. for Protective Order at 6.  The logic of the courts is clear, as courts have been loathe to subject senior executives to unnecessary and harassing depositions each time their company is engaged in a lawsuit.  Here, Paice is not seeking Mr. Press's knowledge regarding Chrysler.  Paice is interested only in Mr. Press's knowledge of facts at Toyota at a time that Mr. Press served as a senior officer of Toyota.  Paice has already concluded, based on extensive discovery sought from Toyota over the past five years, that there are no employees of the Defendants within the United States that have the unique and superior personal knowledge possessed by Mr. Press.  *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998) (affirming limitation on the duration and topics of depositions of high-level executives, and noting it was "a reasonable way to balance [plaintiff's] right to discovery with the need to prevent fishing expeditions").

This situation is highly analogous to *Leibholz v. Hariri*, 2008 U.S. Dist. LEXIS 49725 (D.N.J. Jun. 30, 2008).  In *Leibholz*, the plaintiff sought the deposition of a non-party witness who was the high-level executive of a non-party company.  *Id.* at *8.  In moving to quash the subpoena, the non-party argued that the executive "has no conceivable connection with the plaintiff or his claims or with [the defendant's] defenses to the claims, does not know [the plaintiff] and has no personal knowledge of the relevant facts."  *Id.*  The non-party further argued that "depositions of high-level corporate executives may be duplicative, cumulative and burdensome where the person sought to be deposed has no personal knowledge of the events in dispute."  *Id.*  The plaintiff explained that he intended to question the non-party about the sale of the non-party's personal stock and argued that "a party moving to quash a subpoena bears a

heavy burden of proof." *Id.* (citing *Linder v. Dep't of Def.*, 133 F.3d 17, 24 (D.C. Cir.1998)). The district court found:

> [The non-party] did not prove that [the non-party executive's] deposition would be unduly burdensome. [The] deposition is likely to lead to the discovery of admissible evidence under the broad vista of discovery provided by the rules. Therefore, the Court will not quash [the non-party executive's] subpoena.

*Id.*

The facts are analogous to this situation where Mr. Press's status as an executive at Chrysler is irrelevant to the discovery sought by Paice. There are no lower level executives at Chrysler possessing the relevant knowledge of Mr. Press that is critical to Paice's claims. And there are no lower level executives at Toyota who can speak to and explain the basis of Mr. Press's public statements while he was employed at Toyota.

Mr. Press's reliance on the court's opinion in *Gauthier v. Union Pac. Railroad Co.*, 2008 U.S. Dist. LEXIS 47199 (E.D. Tex. June 18, 2008), is misplaced. *Gauthier* is a personal injury case where the decedent was killed in an accident at a railroad crossing. *Id.* at *2. The plaintiff sought the deposition of several high-ranking officers of the railroad. *Id.* at *3. The deponents all presented affidavits stating that they possessed no personal knowledge of the crossing or the accident. *Id.* at *4. The court found that the executives' general knowledge of the defendant's policy on crossing safety was relevant to the case, but that the knowledge was not special or unique and that the information should be sought through less burdensome means. *Id.* at * 13-14. Here, Mr. Press is the person who can explain his public comments and his reasoning in pushing Toyota to build the Prius. His testimony is highly, uniquely relevant to the issue of the appropriate royalty rate in this case.

Mr. Press fails to show a clearly defined and serious injury resulting from the short, targeted deposition sought by Paice. Accordingly, good cause does not exist for issuing a

protective order in this matter.  Paice appreciates that Mr. Press plays a critical role in his job functions at Chrysler and Paice has offered to conduct the deposition at the time and location most convenient for the witness.  Paice is willing to relocate the deposition to a more convenient location than Auburn Hills, if Mr. Press so desires, and will accommodate Mr. Press's schedule in every way possible.

## III.   CONCLUSION

For the foregoing reasons, Paice requests that the Court deny Mr. Press's Motion for a Protective Order.  Paice agrees to work with Mr. Press in order to minimize any burden that a deposition will cause.

Dated:  April 28, 2009.

Respectfully submitted,

/s/ Samuel F. Baxter

Samuel F. Baxter, *Lead Attorney*
State Bar No. 01938000
sbaxter@mckoolsmith.com
**McKOOL SMITH P.C.**
P.O. Box O
104 E. Houston St., Suite 300
Marshall, TX  75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Garret Chambers
State Bar No. 00792160
gchambers@mckoolsmith.com
Kristi J. Thomas
State Bar No. 24027909
kthomas@mckoolsmith.com
**McKOOL SMITH P.C.**
300 Crescent Court Suite 1500
Dallas, Texas  75201
Telephone: (214) 978-4258
Facsimile: (214) 978-4044

Ruffin B. Cordell
State Bar No. 04820550
Ahmed J. Davis
**FISH & RICHARDSON P.C.**
1425 K Street, N.W., 11th Floor
Washington, D.C.  20005
Telephone:  (202) 783-5070
Facsimile:  (202) 783-2331

Robert E. Hillman
**FISH & RICHARDSON P.C.**
225 Franklin Street
Boston, MA  02110
Telephone:  (617) 542-5070
Facsimile:  (617) 542-8906

**ATTORNEYS FOR PLAINTIFF
PAICE, LLC**

Dallas 276484v1

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 28, 2009, the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).

/s/ Samuel F. Baxter
Samuel F. Baxter

13